UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

PHILIP MORRIS USA, INC.,

                Plaintiff,

v.                              Action No. 3:08–CV–527

APPALACHIAN FUELS, LLC,

                Defendant.

## MEMORANDUM OPINION

THIS MATTER is before the Court on cross Motions for Summary Judgment. Plaintiff asserts it is due judgment as a matter of law on the issue of liability. Defendant avers it is due judgment as a matter of law on the issues of liability and damages. For the reasons stated below, the Court will GRANT Plaintiff's Motion for Summary Judgment (Docket No. 34) as to Defendant's liability on the contract and DENY Defendant's Motion for Summary Judgment (Docket No. 44) in its entirety.

### I. BACKGROUND

#### A. Factual History

This dispute arises from the alleged breach of a fixed-price Coal Supply Agreement between Plaintiff, Philip Morris USA, Inc. ("Philip Morris" or "Buyer"), and Defendant, Appalachian Fuels, LLC ("Appalachian" or "Seller"). (See Pl.'s Mem. Supp. Pl.'s Mot. Summ. J. Ex. 2 ("Agreement").) The Agreement took effect as of September 21, 2006 and, barring termination or cancellation, would have continued at least until September 30,

1

2009 ("Initial Term"). If it notified Appalachian within thirty days of the expiration of the Initial Term, Philip Morris, at its sole discretion, could extend the Agreement until September 30, 2010 ("Continuation Term"). (Agreement § 1.1.)

In the Agreement, the parties contracted for Appalachian to supply and Philip Morris to buy 90% of Plaintiff's coal requirements for its Park 500 and Bells Road facilities (collectively, "Facilities"). (Id. § 2.2.) The parties agreed Philip Morris would pay $62.50 per ton of coal, transportation costs at either $22.60 or $24.15 per ton depending on the mine from which the coal was shipped, and any rail carrier fuel charges incurred by Appalachian in delivering the coal. (Id. § 5.1.) The Agreement provided a yearly estimate of Philip Morris's coal requirements at 122,500 tons per year for the Park 500 facility and 31,500 tons per year for the Bells Road facility.[1] As such, the Agreement was valued in excess of $52 million. (See "Contract Approval Cover Sheet" attached to the Agreement.)

With regard to seller's failure to deliver coal as requested, the parties agreed:

> If seller fails to load coal into railcars and/or trucks on the mutually agreed to mine loading dates as set forth in Section 2.3 and, as a result thereof, Buyer is thereby forced to purchase coal or alternate fuels from other suppliers during such Contract Year ("Replacement Fuel"), then to the extent such failure was not excused pursuant to [Force Majuere] and to the extent Buyer's annual requirements of coal for the Contract Year did not exceed the maximum annual quantity as stated in Buyer's then-current forecast, Seller shall pay Buyer an amount equal to the positive difference, if any, between: (i) the delivered price in cents per million BTU paid by Buyer to purchase Replacement Fuel from any other supplier Buyer may choose, including any additional charges such as handling, unloading or transportation, and (ii) the [p]rice Buyer would have paid for the coal under this Agreement. Such

---

[1] Relatedly, the parties agreed that Philip Morris would provide nonbinding forecasts of each Facility's coal needs in six month intervals. (Agreement § 2.3.1.)

> payment obligation shall be reduced to the extent of any payments made by Seller pursuant to Section 3.4.

(Agreement § 2.4 ("Cover Clause").)

With regard to substitute shipments in case coal was not delivered as agreed, the Agreement states:

> Upon rejection of any Shipment, during any period of suspension of deliveries and following any cancellation of this Agreement by Buyer in accordance with Article 9, Buyer may arrange for deliveries of coal and/or alternate fuels as a replacement for the coal to have been delivered hereunder and Seller shall be liable to reimburse Buyer to the extent the delivered cost of such replacement fuel (on a BTU equivalent basis) exceeds the Price for coal hereunder. Any such purchases shall not reduce or count against Buyer's right, pursuant to Section 2.2, to purchase up to 10% of Buyers' [sic] coal requirements from other suppliers.

(Agreement § 3.4 ("Substitute Shipments Clause").)

With regard to invoices, the parties agreed,

> Following each [s]hipment of coal delivered to Buyer, Seller will promptly forward an invoice to Buyer. . . . accompanied by all required documentation necessary to support all charges, including the rail car or truck numbers, shipping date, name of Seller's Mine from which the coal was delivered, shipping point, correct weight, Price and total invoice amount, including computation thereof. . . . Any invoices submitted to Buyer in an improper format or without the required documentation will be returned unpaid to Seller for correction and resubmission.

(Id. § 6.1 ("Invoice Clause").) The Agreement also required,"Seller shall include with each invoice for payment submitted . . . (a) the applicable freight district from which such [s]hipment originated, (b) the [s]hipment weight and (c) any applicable fuel surcharges assessed on Seller by the delivering rail carrier for such [s]hipment." (Id. § 5.1.1(b).)

With regard to payment, the parties agreed,

3

> Buyer shall pay all undisputed portions of properly documented invoices within 30 days of receipt of Seller's invoice or Seller's delivery of the coal described on the invoice, whichever is later. . . . If Buyer disputes any portion of an invoice, Buyer shall provide written notice to Seller indicating the reason Buyer is withholding any amount, and shall pay the undisputed portion of the invoice. Neither the payments made to Seller, nor the method of such payments shall relieve Seller of its obligation to perform hereunder in strict compliance with the requirements herein.

(Id. § 6.2 ("Payment Clause").)

With regard to cancellation of the contract, the parties agreed as follows:

> Either party may cancel this Agreement effective immediately upon written notice to the other in the case of the bankruptcy or insolvency of the other party, or a breach by the other party of any of the terms and conditions of this Agreement, without prejudice to any other rights or remedies the non-breaching party may have, provided the breaching party fails to remedy such breach within thirty (30) days of receiving notice of such breach.

(Id. § 9 ("Cancellation Clause").)

With regard to notices, the parties agreed as follows:

> All notices under this Agreement shall be in writing and (a) hand delivered; (b) transmitted by legible telecopy with a copy sent concurrently by certified mail, return receipt requested; or (c) delivered by prepaid priority delivery service. Notice shall be sent to the following representative or such other representatives as the parties may subsequently provide.
>
> If to [Appalachian]: New River Energy, PO Box 826, 8336 Main Street, Pound, VA 24279, Attention: Tonya Mullins, Fax: 276-796-6172
>
> If to [Philip Morris]: Philip Morris USA Inc., 615 Maury Street, Richmond, VA 23224, Attention: Richard Wraase ("Wraase").

(Id. § 18 ("Notice Clause").) The Notice Clause notwithstanding, the parties routinely used email for day-to-day communication.

In March 2008, Appalachian could not deliver coal by rail to Philip Morris. As a result, it arranged to deliver coal by truck to the Facilities. This required "[d]ozens of truck deliveries" in March. (Pl.'s Mem. Supp. Pl.'s Mot. Summ. J. 6.) Apparently, the Facilities processed and paid invoices separately. On several occasions, Defendant trucked coal to the Bells Road facility and invoiced the Park 500 facility and vice versa, causing discrepancies in the monies Plaintiff owed and paid Appalachian. These discrepancies often resulted in Appalachian having to credit overpayments to Philip Morris.

At various times during a period spanning July 2007 to May 2008, Philip Morris made payments more than thirty days after it received invoices from Appalachian, the Payments Clause notwithstanding. Plaintiff sent one of these past due payments forty-seven days after Appalachian invoiced it for the coal delivery. (See Dyer Dep. Ex. 9 ("Defendant's Invoice Chart").)

On March 21, 2008, Jody Dixon ("Dixon") on behalf of Defendant, emailed Invoice No. 13507 to Philip Morris in the amount of $4,752.50. The invoice did not identify the truck numbers for the coal billed in this invoice in accordance with the Invoice Clause. By an email dated April 1, 2008, Diane Dalton ("Dalton"), on behalf of Plaintiff, contacted Dixon to request that Appalachian furnish truck numbers so that Philip Morris could verify the charges on the invoice. Appalachian never responded to Dalton's email, and Appalachian never furnished Plaintiff with the truck numbers that Dalton claims were requested. However, Dixon, by an email dated July 16, 2008, informed Dalton that

5

Invoice No. 13507 remained outstanding and sent another copy of the invoice. This was the only communication regarding the alleged nonpayment of Invoice No. 13507.

The day after Dixon's email to Dalton, July 17, 2008, Appalachian sent Philip Morris, via facsimile, a letter stating that Appalachian was cancelling the Agreement ("Cancellation Letter"), for "nonpayment" by virtue of § 9 of the Agreement. (See Compl. Ex. A.) Although not directly mentioned in the Cancellation Letter, Invoice No. 13507 was the only invoice that allegedly remained unpaid, but, as of the date of the Cancellation Letter, Philip Morris actually had a credit of $9,588.13—an amount exceeding the amount claimed on Invoice No. 13507.

The day after receiving the Cancellation Letter, Philip Morris sent Appalachian, via facsimile and email, a letter protesting Appalachian's cancellation of the Agreement ("Protest Letter"). The Protest Letter referred Appalachian to § 15.1 of the Agreement, which set out procedures for the resolution of disputes. (Compl. Ex. B.) According to § 15.1, the parties agreed it was their intention to "make a good faith effort to resolve, without resort to litigation or arbitration, any dispute, controversy or claim arising out of or relating to th[e] Agreement or any purchase order." (Agreement § 15.1.) Philip Morris stated in the Protest Letter that Appalachian had obligations under § 15.1 to provide it notice of nonpayment, allow it twenty days to cure the nonpayment, work with it in good faith to resolve the dispute, and continue to perform its obligations under the Agreement while the parties resolved the dispute. (Compl. Ex. B.) The Protest Letter also stated that Philip Morris "fully expect[s] Appalachian to honor shipments in accordance with the most

recent forecast." (Id.) Apparently, Appalachian did not respond to the Protest Letter and has refused to deliver any more coal under the Agreement. Plaintiff subsequently arranged to have coal delivered from other sources, although coal prices had risen significantly by the time Defendant cancelled the Agreement—reportedly, as high as $160 to $180 per ton by the end of July 2008.

## B. Procedural History

Plaintiff filed its Complaint in this Court August 19, 2008, based upon diversity of citizenship, alleging breach of contract. The Complaint alleges damages in excess of $5,862,150, the costs in excess of the contract price incurred by August 2008 as a result of obtaining replacement coal from alternative sources. The Complaint also claims damages for any other costs paid in excess of the contract price for the remainder of the Initial Term and costs associated with finding fuel supplies for the Continuation Term.

Defendant filed its answer on September 9, 2008 listing thirteen defenses, including failure to state a claim and various affirmative defenses. Thereafter, Appalachian filed a Motion to Amend/Correct Answer, which the Court granted, allowing Defendant to add the defense of "lack of mutuality." (Am. Answer ¶ 41.) Subsequently, Appalachian withdrew its affirmative defenses of "a superseding and/or intervening cause or causes," discharge of duties due to "impossibility and/or impracticability," "mutual mistake," "frustration," and "Events of Force Majeure." (See Def.'s Answers to Interrogs. Nos. 8-13, 15.) Thus, the

only remaining, relevant, and specifically-identified affirmative defenses asserted by Appalachian are: (1) lack of mutuality and (2) various breaches by Plaintiff.[2]

## II. LEGAL STANDARD

A motion for summary judgment lies only where "there is no genuine issue as to any material fact" and where "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The Court must view the facts and the inferences drawn therefrom in the light most favorable to the non-moving party. Ballinger v. N.C. Agric. Extension Serv., 815 F.2d 1001, 1004 (4th Cir. 1987). While viewing the facts in such a manner, courts look to the affidavits or other specific facts to determine whether a triable issue exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not appropriate if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. To overcome a motion for summary judgment, the non-moving party must establish that a genuine issue of material fact actually exists. Fed. R. Civ. P. 56(e); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-86, 586 n.11 (1986). "Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law." Emmett v. Johnson, 532 F.3d 291, 297 (4th Cir. 2008). "Where no genuine issue of material fact

---

[2] Defendant's assertion that its duties were discharged "by operation of law" basically amounts to a reassertion of Plaintiff's alleged breaches and the alleged lack of mutuality. (See Def.'s Answer to Interrog. No. 14 (stating law operated to discharge its duties under the Agreement "by the fact the Agreement lacked mutuality and Plaintiffs' [sic] breach[ed] the terms of the Agreement on multiple occasions").)

exists," it is the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." Drewitt v. Pratt, 999 F.2d 774, 778–79 (4th Cir. 1993) (internal quotation marks omitted).

## III. DISCUSSION

Plaintiff's Motion asserts it is due judgment as a matter of law on the issue of liability because (1) the Agreement constitutes a valid and enforceable contract and (2) Appalachian breached the Agreement by cancelling the contract without justification and without providing the proper notice as the Agreement required. In response, Defendant argues (1) Philip Morris breached the Agreement making late payments as detailed in Defendant's Invoices Chart or, in the alternative, (2) the Agreement fails and is unenforceable because the Agreement lacks mutuality, and, if it is liable under the Agreement, (3) the Agreement only entitles Philip Morris to liquidated damages and (4) Philip Morris may not seek any damages for the Continuation Term due to a lack of certainty and because seeking such would breach Plaintiff's duty to mitigate damages.

As discussed in more detail below, Defendant's arguments lack merit. Under Virginia law, the law selected by the parties (Agreement § 19), a valid contract existed between the parties, and, based upon the plain language of the Agreement, Defendant improperly cancelled and, therefore breached, the Agreement thereby entitling Plaintiff to damages as provided under Virginia's Uniform Commercial Code ("U.C.C."). See Va. Code Ann. § 8.1A-101 et seq. (2008).

9

### A. Mutuality of Contract

Despite Defendant's contention, the Agreement, which amounts to a requirements contract, does not fail for lack of mutuality. "Generally, where the consideration for the promise of one party is the promise of the other party, there must be absolute mutuality of engagement, so that each party has the right to hold the other to a positive agreement. Both parties must be bound, or neither is bound." Capps v. Capps, 219 S.E.2d 901, 904 (Va. 1975) (citing Vinton v. Roanoke, 80 S.E.2d 608, 617 (Va. 1954); Am. Agric. Chem. Co. v. Kennedy, 48 S.E. 868, 870 (Va. 1904)). Here, Philip Morris and Appalachian exchanged mutual promises that constitute valid consideration and form a binding agreement: Philip Morris promised to buy 90% of its coal needs for the Facilities from Appalachian, while Appalachian promised to supply the same. Moreover, the parties operated under the Agreement for almost two years, thereby demonstrating the intention of both parties to be bound by that contract. Defendant cannot simply declare at this juncture that no valid contract ever existed.[3]

### B. Breach of Contract

Since the parties largely agree on the material facts underlying this case, and the Court has determined that the Agreement does not fail for lack of mutuality, the disposition of this matter turns on the Court's interpretation of that document's clear and unambiguous

---

[3] To the extent that the "mutuality of obligation" defense refers to mutuality of remedy, the defense is inapplicable. Virginia courts have typically allowed a mutuality of remedy defense where the plaintiff has sued for specific performance of the contract. See, e.g., Major v. Price, 84 S.E.2d 445 (Va. 1954). Plaintiff here sues for damages, not the equitable remedy of specific performance.

### A. Mutuality of Contract

Despite Defendant's contention, the Agreement, which amounts to a requirements contract, does not fail for lack of mutuality. "Generally, where the consideration for the promise of one party is the promise of the other party, there must be absolute mutuality of engagement, so that each party has the right to hold the other to a positive agreement. Both parties must be bound, or neither is bound." Capps v. Capps, 219 S.E.2d 901, 904 (Va. 1975) (citing Vinton v. Roanoke, 80 S.E.2d 608, 617 (Va. 1954); Am. Agric. Chem. Co. v. Kennedy, 48 S.E. 868, 870 (Va. 1904)). Here, Philip Morris and Appalachian exchanged mutual promises that constitute valid consideration and form a binding agreement: Philip Morris promised to buy 90% of its coal needs for the Facilities from Appalachian, while Appalachian promised to supply the same. Moreover, the parties operated under the Agreement for almost two years, thereby demonstrating the intention of both parties to be bound by that contract. Defendant cannot simply declare at this juncture that no valid contract *ever* existed.[3]

### B. Breach of Contract

Since the parties largely agree on the material facts underlying this case, and the Court has determined that the Agreement does not fail for lack of mutuality, the disposition of this matter turns on the Court's interpretation of that document's clear and unambiguous

---

[3] To the extent that the "mutuality of obligation" defense refers to mutuality of remedy, the defense is inapplicable. Virginia courts have typically allowed a mutuality of remedy defense where the plaintiff has sued for specific performance of the contract. See, e.g., Major v. Price, 84 S.E.2d 445 (Va. 1954). Plaintiff here sues for damages, not the equitable remedy of specific performance.

language. Palmer & Palmer Co., LLC v. Waterfront Marine Constr., Inc., 662 S.E.2d 77, 80 (Va. 2008) ("When a contract is clear and unambiguous, it is the court's duty to interpret the contract[] as written.") (citing Winn v. Aleda Constr. Co., 315 S.E.2d 193, 194 (Va. 1984); PMA Capital Ins. Co. v. U.S. Airways, Inc., 626 S.E.2d 369, 372 (Va. 2006)). "A contract is not ambiguous because the parties disagree as to the meaning of the terms used." TM Delmarva Power, LLC v. NCP of Virginia, LLC, 557 S.E.2d 199, 200 (Va. 2002) (citing Ross v. Craw, 343 S.E.2d 312, 312-13 (Va. 1986)). "The guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used," so the Court is "bound to say that the parties intended what the written instrument plainly declares." W.F. Magann Corp. v. Va.-Carolina Elec. Works, Inc., 123 S.E.2d 377, 381 (Va. 1962). "[T]he parties' contract becomes the law governing the case unless it is repugnant to some rule of law or public policy." Palmer, 662 S.E.2d at 80 (citing Winn, 315 S.E.2d at 194).

Each party claims that the other breached the Agreement, thereby entitling it to summary judgment. Although mentioned nowhere in the Cancellation Letter, Appalachian now claims that each late payment occurring between July 2007 and May 2008 constituted a breach of the Agreement, entitling it to cancel the Agreement.[4] (Def.'s Mem. Opp'n Pl.'s

---

[4] The Court notes that, in the Cancellation Letter, Appalachian claimed that it was cancelling the Agreement "*for non-payment* pursuant to Section 9 of the Coal Supply Agreement." (Compl. Ex. A (emphasis added).) This language does not suggest that Appalachian cancelled the Agreement due to *late payments*, as it now asserts. With regard to any "nonpayment," Defendant's records demonstrate that only one invoice remained outstanding on July 17, 2008, when Appalachian faxed the Cancellation Letter to Philip Morris. (See Def.'s Invoices Chart (listing invoice no. 13507 as "open").) Even if invoice No. 13507 remained "open," Appalachian's own records show that when it sent the

Mot. Summ. J. 5-6.) Philip Morris maintains that, even assuming that all ten of the alleged late payments were in fact late, Appalachian violated the terms of the Agreement when it cancelled the Agreement because it failed (1) to provide Philip Morris proper notice that it considered Plaintiff in breach of the Agreement and (2) to allow Philip Morris thirty days to cure the alleged breach.

Observing the clear language of the Agreement and applicable case law, Plaintiff ultimately gets the better of the argument. The plain language of the Agreement does not allow cancellation of the contract based solely upon late payment. In the Cancellation Clause, the parties agreed upon specific steps the parties must take in order to cancel the Agreement based upon a party's alleged breach. In such a case, the Cancellation Clause required the cancelling party to give the breaching party notice and thirty days to cure the alleged breach.[5] (See § 9 ("Either party may cancel this Agreement effective immediately . . . *provided* the breaching party fails to remedy such breach within thirty (30) days of receiving notice of such breach.") (emphasis added).) The parties also agreed, according to the Notice Clause, that "[a]ll notices under th[e] Agreement shall be in writing," sent via specific means, and, if to Philip Morris, sent to the attention of one Richard Wraase.

---

Cancellation Letter it actually owed Philip Morris a credit of at least $9,588.13 for shipments erroneously charged; these credits more than cover the amount owed on the "open" invoice. (Id. at 12-13; cf. Def.'s Invoices Chart (showing credits due of $7,950.63 and $1,637.50).) Accordingly, Defendant cannot claim any breach based upon "non-payment," as claimed in the Cancellation Letter.

[5] Defendant argues that late payments could never be "cured." (Def.'s Mem. Supp. Def.'s Mot. Summ. J. 10 ("Although the Agreement provides thirty (30) days to cure a breach, a late payment is something that simply cannot be cured."); Def.'s Reply Supp. Def.'s Mot. Summ. J. 8.) The Court considers the contention untenable.

(Agreement § 18.) Thus, to satisfy the Agreement's requirements, Appalachian should have sent written notice—"by hand deliver[y]," "legible telecopy with a copy sent concurrently by certified mail, return receipt requested," or "by prepaid priority delivery service"—to Richard Wraase stating that Philip Morris had breached the agreement and then allowed Plaintiff the agreed-upon cure period. (Id.) Appalachian fulfilled neither of these requirements. As a result, Appalachian breached, and is liable under, the Agreement.

Appalachian argues that late payments by Philip Morris somehow excuses this breach. (See Def.'s Resp. Opp'n Pl.'s Mot. Summ. J. 6.) With regard to this contention, the Virginia Supreme Court has stated, "The principle is general that wherever a contract not already fully performed on either side is continued in spite of a known excuse, the defense thereupon is lost and the injured party is himself liable if he subsequently fails to perform, unless the right to retain excuse is not only asserted but assented to." Am. Chlorophyll, Inc. v. Schertz, 11 S.E.2d 625, 628 (Va. 1940) (citing 3 Williston, Contracts § 688 (Rev. ed.)). There, the Court refused to allow the plaintiff (the counterclaim defendant) to excuse his breach of a contract based upon the prior breaches of the contract by defendant (the counterclaim plaintiff). The Court stated, "[The counterclaim defendant] attempts to excuse this default by pointing to the [counterclaim plaintiff]'s prior default. This he may not do." Schertz, 11 S.E.2d at 628. By continuing performance for a significant period of time following the first alleged late payment, the parties here unquestionably had conducted themselves as if the late payments did not constitute a breach of the Agreement. Thus, Schertz's principle applies in the instant case: Appalachian may not seek to excuse its

13

breach of the Agreement by pointing to Philip Morris's alleged breaches.

Defendant contends, "According to Philip Morris, it could have (1) not made payments within 30 days, (2) required Appalachian to send a written notice of late payment, and then (3) have 30 more days to make a payment. Such construction is patently absurd." (Def.'s Resp. Opp'n Pl.'s Mot. Summ. J. 7.) Defendant's argument to the contrary notwithstanding, the clear, unambiguous language to which Defendant agreed when it signed the Agreement created the requirements the Court now enforces. (See Agreement § 9.) As the Virginia Supreme Court has clearly stated, "Courts, though they have long arms, cannot relieve one of the consequences of a contract merely because it was unwise." Carter v. Carter, 291 S.E.2d 218, 221 (Va. 1982) (quoting Planters Nat'l Bank v. E.G. Heflin Co., 184 S.E. 216, 219 (Va. 1936)). Appalachian signed on to what it subsequently considered to be an unfavorable contract. It cannot now ask the Court to invalidate its obligations. There is no basis for the Court to reform the Agreement since there are no allegations of either mutual mistake or unilateral mistake accompanied by misrepresentation or fraud. See Ward v. Ward, 387 S.E.2d 460, 462 (Va. 1990) (citing Gibbs v. Price, 150 S.E.2d 551, 552 (Va. 1966); Larchmont Props. v. Cooperman, 80 S.E.2d 733, 738 (Va. 1954)).

Accordingly, Philip Morris, is due judgment as a matter of law as to liability based upon Appalachian's breach of the Agreement.

C. Damages

Here, Defendant argues (1) the Agreement contains a liquidated damages provision which limits Plaintiff's remedies to the cost of the alternate fuel Plaintiff has already obtained, (2) Plaintiff cannot recover damages for the Continuation Term because the option had not been exercised at the time Defendant cancelled the Agreement, (3) Plaintiff cannot recover damages for the Continuation Term because doing so would breach Plaintiff's duty to mitigate its damages, and, at least implicitly, (4) damages incorporating the Continuation Term should be treated as profits which—if uncertain, speculative, or contingent—are impermissible. Plaintiff responds (1) the Agreement contained no liquidated damages provision, (2) even if the Agreement contains such a provision, the Agreement does not make such provision the exclusive remedy for an unlawful repudiation, and (3) the valid, enforceable right to exercise an option, supported by mutual consideration, does not breach the duty to mitigate damages. Defendant's arguments fail.

1. Liquidated Damages Provision

Defendant argues that the Court should read the Substitute Shipment Clause and Cover Clause together and determine that these provisions of the Agreement, taken together, constitute a liquidated damages provision that limits Plaintiff's recovery. (Def.'s Mem. Supp. Def.'s Mot. Summ. J. 13 (citing Taylor v. Sanders, 353 S.E.2d 745 (Va. 1987); Washington & Old Dominion Ry. v. Westinghouse Elec. & Mfg. Co., 89 S.E. 131 (Va. 1916); Welch v. McDonald, 8 S.E. 711 (Va. App. 1888)).)

While it is true Virginia courts have recognized liquidated damages provisions, see, e.g., Envirotech Corp. v. Halco Eng'g, Inc., 364 S.E.2d 215 (Va. 1988) (finding liquidated damages provision where contract exclusively denied consequential damages); Taylor, 353 S.E.2d at 745 (finding liquidated damages provision where contract stated earnest deposit would be treated as full damages), it is unclear that the clauses to which Defendant directs the Court's attention actually constitute a liquidated damages provision. First, the Substitute Shipment Clause clearly does not apply in the instant matter because Philip Morris did not "reject[] any Shipment, during any period of suspension of deliveries," or "cancel[] . . . th[e] Agreement in accordance with Article 9." (Agreement § 3.4.) Here, Appalachian cancelled the Agreement. Conversely, whether the Cover Clause applies presents a closer question. However, the Court does not need to reach this determination because nothing in the Agreement expressly limits a party's remedy to any putative liquidated damages provision, as required by Virginia law. See Va. Code Ann. § 8.2-719(1)(b) ("[R]esort to a remedy as provided [in the contract] is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy."); see id. cmt. 2 ("Subsection (1)(b) creates a presumption that clauses prescribing remedies are cumulative rather than exclusive. If the parties intend the term to describe the sole remedy under the contract, this must be clearly expressed."). Thus, even if the Court construed the Cover Clause to be a liquidated damages provision, Philip Morris has the statutory right to assert any remedy it is due under Virginia law.[6]

---

[6] In relevant part, Virginia's U.C.C. provides for Buyers' remedies in the case of breach in §§ 8.2-711–8.2-713 and 8.2-715. According to § 8.2-711, the buyer may seek

16

2. <u>Continuation Term</u>

All of Defendant's arguments with regard to disallowing inclusion of damages based upon the Continuation Term fail. Under Virginia Law, "Direct damages are those that flow 'naturally' from a breach of contract; i.e., those that, in the ordinary course of human experience, can be expected to result from the breach, and are compensable." <u>R.K. Chevrolet, Inc. v. Hayden</u>, 480 S.E.2d 477, 481 (Va. 1997). The loss of the right to hold the seller to an option for coal at the contract price, as negotiated by the parties and included within the resulting contract, constitute damages that "flow naturally" from the noncompliant repudiation of the Agreement. Moreover, under Virginia law, "remedies . . . shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed. . . ." Va. Code Ann. § 8.1A-305; <u>see also</u> <u>Hess Energy, Inc. v. Lightning Oil Co., Ltd.</u>, 338 F.3d 357, 362 (4th Cir. 2003).

---

remedy under either § 8.2-712, providing for "cover" damages ("the difference between the cost of cover and the contract price together with any incidental or consequential damages [under § 8.2-715], but less expenses saves in consequence of the seller's breach"), or § 8.2-713, which entitles the seller to "the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in [§ 8.2-715], but less expenses saved in consequence of the seller's breach." Section 8.2-712(3) reinforces a buyer's right to select between these remedies when it states, "Failure of the buyer to effect cover within this section does not bar him from any other remedy." Section 8.2-715(1) defines "incidental damages" as "damages resulting from the seller's breach includ[ing] . . . commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach." Section 8.2-715(2)(a) defines "consequential damages" as "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise. . . ." Thus, under § 8.2-712 the baseline is the cost of "cover," while under § 8.2-713 the baseline is the "market price . . . determined as of the place for tender."

17

Accordingly, if Philip Morris is to "be put in as good a position as if the other party had fully performed" its obligations under the Agreement, the damages calculation should include the pecuniary damage Philip Morris has suffered as a result of the loss of its exclusive option to have coal at the contract price for the Continuation Term.

Ultimately, because the Agreement was valid and enforceable, the Agreement contains no express limitation of damages, Virginia law provides for at least two means of calculating damages (one exclusive of "cover costs"), and no controlling law supports Appalachian's position as to limiting Plaintiff's remedy with regard to the Continuation Term, the Court must DENY Defendant's Motion for Summary Judgment; Plaintiff's damages will not be limited in the manner Defendant has requested.

## IV. CONCLUSION

For the foregoing reasons, the Court will GRANT Plaintiff's Motion for Summary Judgment as to Defendant's liability on the Agreement and will DENY Defendant's Motion for Summary Judgment in its entirety. The only issue remaining will be the measure of damages applying Virginia's U.C.C.

It will be SO ORDERED.

                                                                                 /s/
                                          James R. Spencer
                                          Chief United States District Judge

ENTERED this   15th   day of April 2009